## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**ROBERT R. BURTCH**                                      **CIVIL ACTION**

**VERSUS**                                                       **NUMBER 06-950-RET-DLD**

**HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY**

## MAGISTRATE JUDGE'S REPORT

This claim for long-term disability benefits under a group disability policy created by plaintiff's employer is before the Court on cross motions for summary judgment filed by plaintiff (rec. doc. 19) and defendant (rec. doc. 15).  Both motions are opposed (rec. docs. 23 and 25).  Plaintiff's claim for long-term disability benefits arises under the Employee Retirement Income Security Act of 1974 ("ERISA"); therefore, this Court's jurisdiction is based on federal question, 28 U.S.C. §1331.

### Background

*Procedural Background*

Plaintiff, Robert R. Burtch, is a former underwriter with American International Group ("AIG"), who retired in 2005 at age 58 after working for AIG for twenty years (rec. doc. 20).  After retiring from AIG, plaintiff moved to Montana because he believe the clean air would help his emphysema.  While employed by AIG, plaintiff was a participant in a group long-term disability plan sponsored by AIG.  The plan was funded by a policy of insurance, Policy No. GLT-675190 (the "LTD Policy"), issued and administered by Hartford Life and Accident Insurance Company ("Hartford")(rec. doc. 16-7).  Plaintiff submitted a claim for long-term disability benefits in September 2005,  and identified his last day of work as

March 18, 2005 (rec. doc. 16-5, p. 52-59). Plaintiff indicated that his medical conditions causing his disability included shortness of breath from emphysema and memory loss. Id. The benefits administrator described the physical aspects of plaintiff's job as requiring plaintiff to stand occasionally, walk frequently, sit continuously,  stoop, kneel, crouch, and reach overhead occasionally, pull file drawers under 5 pounds occasionally, lift and carry files under 5 pounds frequently, use the keyboard and/or write continuously -90% of the time, and use the telephone frequently - 60% of the time (rec. doc. 16-5, p. 59).

After reviewing plaintiff's application for long-term disability benefits and the medical evidence in support of plaintiff's application, defendant informed plaintiff that he did not "meet the policy definition of Disability" and, therefore, benefits were not payable under the terms of the policy (rec. doc. 16-4, p. 13).  Plaintiff requested reconsideration of his claim and submitted additional medical information in support of his disability, which was considered by defendant.  On March 24, 2006, defendant notified plaintiff that it had reviewed the additional medical information and had determined that the additional information did not prove that plaintiff met the definition of Disability under the LTD Policy (rec. doc. 16-3, p. 78). The March 24, 2006, letter informed plaintiff of his right to appeal defendant's denial of the claim for benefits. Id.

On June 13, 2006, plaintiff filed an appeal of defendant's initial denial of the claim for long-term disability benefits under the LTD Policy (rec. doc. 16-3, p. 60).  Plaintiff submitted additional medical evidence and other information in support of his appeal.  As part of the appeal process, defendant reviewed the evidence submitted by plaintiff and engaged three independent physicians to review plaintiff's file and to interview plaintiff's treating physicians to determine plaintiff's medical and functional status (rec. doc. 16, pp.

118-120).   On October 16, 2006, defendant informed plaintiff that  its review process confirmed its original finding that plaintiff did not meet the definition of Disability under the LTD Policy. Id.  Defendant also informed plaintiff that he had exhausted his administrative remedies offered by the appeals process.  Id.

On December 13, 2006, plaintiff filed suit against defendant in this Court for disability benefits under the LTD Policy retroactive to September 19, 2005, and for future payments until plaintiff reaches the age of sixty-five (65) or is no longer qualified under the terms of the policy, prejudgment interest, and reasonable attorney's fees (rec. doc. 1).  Thereafter, the parties filed cross motions for summary judgment, which are before the Court.

*The Plan*

The LTD Policy is governed by ERISA and provides defendant with "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions" of the policy (rec. docs. 16-7, 16-6, p. 18).  The LTD Policy sets forth the claims procedures and claims requirements and explains the administration and handling of claims and decisions. Id.

Under the terms of the LTD Policy, a participant is eligible for long-term disability benefits if during the "Elimination Period" (180 days) and for 24 months thereafter, the participant suffers from an injury, illness, or sickness that prevents him from performing the essential duties of his own occupation and, as a result, his current monthly earnings are less than eighty percent (80%) of his pre-disability earnings.  Id., rec. doc. 16-6, p. 19.  This is considered the "Own Occupation" standard or period of disability by the defendant. Id. The LTD Policy defines "Essential Duties" as a duty that is "substantial, not incidental; is fundamental or inherent to the occupation; and can not be reasonably omitted or changed."

Id.  It also considers it an "Essential Duty" of for the participant "to be at work for the number of hours in your regularly scheduled workweek." Id.  The "Elimination Period" is 180 days and commences from the date of the alleged onset of disability. Id.  The participant must be continuously disabled throughout the entire Elimination Period in order to be eligible to receive benefits. Id, rec. doc. 61-6, p. 12.   Plaintiff's Elimination Period commenced on March 19, 2005 and expired on September 19, 2005 (rec. doc. 16-7).

### Argument of Parties

Defendant explains that the claim at issue involves the "Own Occupation" standard or period of disability (rec. doc. 17).   While at AIG, plaintiff held the position of underwriter, which was an office position that was sedentary in nature and involved primarily clerical functions related to the review and underwriting of insurance risks.  Based on the evidence in the administrative record, including the medical evidence and information submitted by plaintiff and the medical analyses by defendant's independent physicians, defendant determined that the evidence did not support plaintiff's inability to engage in the duties of his own occupation during the elimination period.  Id. Furthermore, in evaluating plaintiff's claim for long-term disability benefits, defendant also argues that it is not required to give deference to the opinions of plaintiff's treating physicians or the determination of the Social Security Administration in granting plaintiff's claim for disability benefits (rec. doc. 25). According to defendant,  there is a rational connection between the denial of disability benefits and the factual determinations made based on the records and information included in the administrative record. Id.

Plaintiff contends that because defendant is both the insurer, the one paying the benefit, and the administrator, the one determining whether the benefit is paid, an inherent

conflict of interest exists in determining whether plaintiff qualifies for long-term disability benefits under the policy.  Plaintiff argues that defendant abused its discretion in denying plaintiff's claim for long-term disability benefits under the LTD Policy based on the medical evidence in the administrative record (rec. doc. 20).  Plaintiff claims that defendant ignored the statements of his treating physicians, including Drrs. William Hines and Catherine Stephens, regarding the severity of his chronic obstructive pulmonary disease (COPD) and inability to work, in evaluating his claim for disability benefits.  Plaintiff believes that the medical evidence submitted by Drrs. Hines and Bogdan Nowakowski proves that he is unable to work "the number of hours in your scheduled workweek," which is one of the essential duties of his own occupation under the LTD Policy. Id.

Plaintiff also claims that defendant ignored the medical evidence from plaintiff's other treating physicians that proves that he suffers from other co-morbid conditions, in addition to his severe emphysema, such as depression, memory loss, an inability to concentrate, coronary artery disease, hypertension, hyperlipedmia, stress, and degenerative disc disease, which prevent him from being able to perform the essential duties of his own occupation.  Plaintiff also argues that the independent physicians hired by defendant to conduct the appeals process performed a mere file review of plaintiff's claim and should have performed a physical examination of plaintiff's condition.

Finally, plaintiff argues that defendant failed to consider as persuasive the fact that he qualified for disability benefits with the Social Security Administration and would be considered disabled by the standards applied by the American Medical Association and American Thoracic Society in evaluating pulmonary disabilities.

**Discussion**

<u>Legal Standard</u>

Summary judgment is an appropriate procedural vehicle for the resolution of a suit by an ERISA plan beneficiary. *Barhan v. Ry-Ron, Inc.* 121 F.3d 198, 201-02(5th Cir. 1997). Once a motion for summary judgment is filed, the usual summary judgment rules control. Id. Thus, summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(C); *Celotex Corp. V. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, affidavits or other factual support demonstrating that it did not abuse its discretion in rejecting the claim by the plan beneficiary. Thereafter, the nonmovant must set forth factual support in proper form tending to show that the defendant abused its discretion and is not entitled to summary judgment. *Barhan*, 121 F.3d at 202. When all of the summary judgment evidence presented by both parties could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial and summary judgment is proper. *Matsushita Elec. Indus. Co. V. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed. 2d 538 (1986).

Under ERISA, a plan administrator must make two findings to determine whether an employee is entitled to benefits under a plan.  *Schadler v. Anthem Life Ins. Co.*, 147 F.3d 388, 394 (5th Cir. 1998).  The plan administrator must first determine the facts of the underlying claim for benefits and then "determine whether those facts constitute a claim to

be honored under the terms of the plan." *Schadler*, citing *Pierre v. Connecticut Gen. Life Ins. Co./Life Ins. Co. Of N. Am*, 932 F.2d 1551, 1557 (5th Cir. 1991).   The proper standard for district court review of the interpretation by the plan administrator of the provisions of the plan is a de novo standard unless the benefit plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire and Rubber Co. V. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Where a plan vests the plan administrator with discretionary authority, the courts review the decision under the more deferential abuse of discretion standard.  *Bruch*, 489 U.S. at 115, 109 S.Ct. at 956-57.  The administrator's factual findings underlying the claim must always be reviewed for an abuse of discretion.  *Schadler,* 147 F.3d at 395.

In applying the abuse of discretion standard of review, the Court analyzes whether the plan administrator acted arbitrarily and capriciously. *Dowden v. Blue Cross & Blue Shield of Texas*, 126 F.3d 641 (5th Cir. 1997); *Sweatman v. Commercial Union Ins. Co.*, 39 F. 3d 594 (5th Cir. 1994).  If the decision on eligibility is supported by substantial evidence and is not erroneous as a matter of law, it will be upheld. *Barhan*, 121 F.3d at 201.  An arbitrary decision "is one made without a rational connection between the known facts and the decision or between the found facts and the evidence." *Dowden*, 126 F.3d at 644.

### Initial Determination

In making the initial determination of plaintiff's application for long-term disability benefits, defendant considered the following information: the September 9, 2005, employee and employee section of the application for long-term disability income benefits; Dr. Hines' September 16, 2005, attending physician statement; office notes and medical records from Dr. Hines for the period March 2005 through October 2005; Dr. Venkat Surakanti's

-7-

November 21, 2005, attending physician's statement; office notes and medical records from Dr. Surakanti's office for the period of February 2005 through October 2005; office notes and medical records from Dr. Donna Dynes for the period March 2005 through September 2005; office notes and medical records from Dr. Stephens for the period November 2005; job description and demands for the position, program underwriter, submitted by AIG (rec. doc. 16-4, p. 14).

Dr. Hines, a pulmonologist, originally indicated on March 15, 2005, that plaintiff would never be able to perform usual work (rec. doc. 16-6, p. 1).  Dr. Hines later indicated on his September 16, 2005, attending physician statement that plaintiff suffers from sever pulmonary obstruction, and that although plaintiff was unable to lift, carry, push, or pull, he could stand for short periods, walk for short distances, and had no problem sitting, driving, or using the keyboard (rec. doc. 16-4, pp. 86-87).  Plaintiff underwent an independent medical exam with a pulmonologist, Dr. Bogdan Nowakowski, on August 2, 2005 (rec. doc. 16-5, p. 71).  Dr. Nowakowski's report showed that plaintiff could perform sedentary work, but may need some accommodation at work or work at least part-time.  Id.  Dr. Nowakowski explained that plaintiff could not work without air conditioning or perform physically demanding work.  Id.  Dr. Surakanti, a cardiologist, indicated on his November 21, 2005, attending physician statement that plaintiff should engage in "no exertive work" (rec. doc. 16-4, p. 45).

Defendant also considered additional medical information submitted from Drrs. Ferrara, Thad Broussard, Dynes, and Patrick Jones, M.S.  The medical information submitted from Dr. Broussard reflects that plaintiff was seen for pain in his back and neck on February 18, 2005 (rec. doc. 16-4, pp. 59-70).  Dr. Broussard's attending physician

statement of disability reflects a primary diagnosis of cervical spondylosis, a secondary diagnosis of lumbar spondylosis, and a small disc herniation.   Dr. Broussard did not complete the physical capacities evaluation form because, as he stated, he is not a "disabling physician," and failed to specifically comment on plaintiff's impairment other than to state generally that plaintiff has "other more serious conditions which disable him." Id., at pp. 61-64.

The information from Dr. Dynes, neurologist, indicated that plaintiff presented with short-term memory problems.  The March 1, 2005, MRI and September 8, 2005, PET brain scan performed by Dr. Dynes were both normal.   Plaintiff never underwent neuropsychological testing  to confirm cognitive deficits.

The information submitted from Patrick Jones, MS, showed that plaintiff began treating with Jones on November 11, 2005, which was after the expiration of the Elimination Period.   Additionally, defendant notified plaintiff that Jones did not have a doctorate; therefore, he did not meet the policy definition of "Physician" and could not therefore  certify disability (rec. doc. 16-4, p. 16).   Similarly, defendant reminded plaintiff that he began treating with Dr. Stephens, a pulmonologist, on November 29, 2005, which was *after* the Elimination Period.  Defendant nevertheless considered the medical information submitted by Dr. Stephens, which stated that plaintiff's condition was managed through medication and which noted that he was using 2 liters of oxygen upon exertion and at nighttime.

After reviewing the medical evidence in conjunction with the requirements of plaintiff's occupation, defendant concluded that the information submitted by Dr. Dynes was insufficient to support a claim for disability based on memory loss. Additionally, although it was clear that plaintiff had pulmonary symptoms and limitations, defendant found that

they would not prevent him from performing the essential duties of his own occupation which is classified as a sedentary job (rec. doc. 16-4, p. 16).

*Reconsideration - Supplemental Information*

After initially denying plaintiff's claim for long-term disability benefits on January 12, 2006, defendant allowed plaintiff to submit additional information in the form of a February 2, 2006, letter from Dr. Dynes; March 15, 2006, letter from Dr. Hines; and pulmonary function tests results from the Billings Clinic and the Pulmonary Disease Clinic.  Dr. Dynes' letter shows that he treated plaintiff from February 23, 2005, to August 26, 2005, for complaints of memory problems and depression (rec. doc. 16-3, p. 82).  Dr. Dyes ordered several tests, including a mini-mental status test and an MRI of plaintiff's brain, all of which were normal. Dr. Dynes stated that "[a]lthough plaintiff tested well in the office, your description of these problems would indeed be of the level where they would render you incapable of fully performing your job responsibilities, although you stated in August that your disability was due to the COPD." Id. at 83.

Dr. Hines' March 15, 2006, letter explained that although he agreed, as previously stated in his attending physician statement, that plaintiff could drive and use a keyboard, he believed that plaintiff's ability to do these things was limited (rec. doc. 16-3, p. 62).  Dr. Hines also stated that he suspected that plaintiff would have repeated absences from work due to the severity of his lung disease, which would make it difficult for him to maintain employment.   Id.   Finally, plaintiff submitted the pulmonary function tests from his pulmonologist in Billings, Montana, and an article from the Internet addressing how different agencies evaluate disability based on pulmonary function (rec. doc. 16-3, pp. 84-100).

After reviewing the additional information submitted by plaintiff, defendant informed plaintiff that all of the tests performed by Dr. Dynes were found to be normal, and that it appeared that Dr. Dynes based his opinion that plaintiff is disabled on plaintiff's self-reported symptoms (rec. doc. 16-3, p. 78). Defendant did not find that Dr. Hines' provided any additional information to support that plaintiff satisfied the definition of Disability under the LTD Policy. Id. Defendant acknowledged that the pulmonary function test results proved that plaintiff suffered from a pulmonary condition, but stated that those tests did not prove that plaintiff is disabled in accordance with the provisions of the LTD Policy. Id. Finally, defendant informed plaintiff that the information from the Social Security Administration, American Medical Association, and American Thoracic Society was not dispositive because although all of the agencies used the term "disability," they applied different criteria for evaluating a disability. Defendant thus maintained its decision to deny plaintiff's application for benefits (rec. doc. 16-3, p. 78).

_Final Appeal_

In connection with plaintiff's final appeal, plaintiff submitted the August 5, 2006, notice of award of the Social Security Administration finding plaintiff disabled and awarding him benefits, and the following additional medical information: a March 15, 2006, letter from Dr. Hines; a February 2, 2006, letter from Dr. Dynes; June 7, 2006, and July 6, 2006, letters from Dr. Donna Veraldi. The letters from Drrs. Dynes and Hines are discussed above. The June 7, 2006, letter and clinical notes from Dr. Veraldi indicated that plaintiff referred himself to Dr. Veradli for treatment for symptoms of memory loss, reduced energy, and depression (rec. doc. 16-3, pp. 39-43). Plaintiff saw Dr. Veraldi a total of four times between February 20, 2006 and April 24, 2006. Id. Dr. Veraldi suggested that plaintiff

-11-

pursue neuropsychological evaluation in order to assess whether he exhibits impairments in functioning, but apparently plaintiff never did.[1]

As part of the final appeal process and in order to clarify plaintiff's medical and functional status, defendant requested that three independent physicians with the University Disability Consortium review plaintiff's claim file:   Dr. Rosaline Vasquez, board certified in internal medicine; Dr. Robert Marks, board certified in neurology, physical medicine and rehabilitation; and Dr. Jacqueline Oleander, neuropsychologist.   Although these physicians did not personally examine plaintiff, they did review the plaintiff's entire file and personally speak with plaintiff's treating physicians regarding plaintiff's ability to perform his own occupation.

Dr. Vasquez not only reviewed plaintiff's entire file, but also she spoke directly with plaintiff's treating physician, Dr. Hines, to obtain an update on plaintiff's status (rec. doc. 16, p. 81).   Dr. Hines informed Dr. Vasquez that plaintiff was stable, but susceptible to recurrent purulent bronchitis.  Dr. Hines explained that when plaintiff contracts an infection, he is worse than his baseline.  Dr. Hines opined that plaintiff could work at a desk job when stable, although he might not be reliable,  given his bouts of infection.   Dr. Vasquez confirmed that plaintiff was not hospitalized during prior infectious episodes in October 2004, December 2004, March 2005, and April 2005, and that he required oxygen only at nighttime.  Id.

---

[1] Defendant's October 16, 2006, letter denying plaintiff's appeal states as follows: "[a]ccording to our recent phone conversation you indicated that despite Dr. Veraldi's recommendation for [plaintiff] to undergo a neuropsychological evaluation, [plaintiff] has not yet had such an evaluation." (rec. doc. 16, p. 119).

Dr. Vasquez concluded that plaintiff's medical limitations "would allow him to carry out a full time sedentary to light occupation as is described in his job description with the accommodation to do walking of intermittent short distances," which would have applied from March 2005 through September 2005. Id., at p. 85.   Dr. Vasquez noted that exacerbations of plaintiff's pulmonary disease might cause absences from work.  Id.

Dr. Marks conducted a co-morbid review of plaintiff's entire file and spoke directly with plaintiff's treating physician, Dr. Dynes, to obtain an update on plaintiff's status (rec. doc. 16, pp. 66-72). Dr. Dynes reported that he evaluated plaintiff for complaints of memory problems, but no cognitive problems were uncovered. Id., at p. 70.  Neither the MRI nor the PET scan revealed evidence of pathology to account for major cognitive deficits; therefore, Dr. Dynes opined that plaintiff's depression and chronic pain might have more to do with his memory complaints.  Dr. Dynes also stated that pulmonary disorders, such as COPD, most likely have more to do with any disability suffered by the plaintiff. Id.   After reviewing plaintiff's entire medical file, Dr. Marks concluded that "there was no evidence of an organic patho-anatomic basis for the memory complaints."  Although Dr. Marks found that plaintiff suffered from some degenerative spine changes that would suggest some limitations such as avoiding lifting, pulling, pushing greater than 10 pounds on a more than occasional basis, avoiding improper frequent bending of the spine, and kneeling or squatting to retrieve items from the floor, plaintiff would be able to perform the duties of his own occupation from March 19, 2005 through September 18, 2005 and beyond.  Id.

Dr. Oleander reviewed plaintiff's entire file and spoke directly with plaintiff's treating physician, Dr. Veraldi, to obtain an update on plaintiff's status (rec. doc. 16, pp. 53-62). Dr. Veraldi reported that she evaluated plaintiff for problems with memory loss, reduced

energy, and depression and diagnosed him with depressive disorder, NOS.  Dr. Veraldi explained that plaintiff's normal neurology exam, including MRI and PET scan, was not unusual for a person who has mild impairments.   Dr. Veraldi reported that plaintiff participated in four treatment sessions, but was  not currently in treatment  because his depression had improved.  Dr. Veraldi recommended neuropsychological testing, and then based on the results of the testing, planned to recommend cognitive rehabilitation or psychotherapy.  Dr. Veraldi did not know why plaintiff failed to complete testing, and she acknowledged that plaintiff's cognitive issues of memory loss, reduced energy, and depression were self-reported.  She was of the opinion that plaintiff's depression would not keep him from working, but she did not know whether he had sufficient energy to work an eight hour day.  Id.

Dr. Oleander concluded, based on a review of the medical records and the telephone interview with Dr. Veraldi, that there was insufficient documentation and objective evidence to suggest that plaintiff had experienced significant changes in his cognitive, psychological, or psychiatric functioning that would render him unable to work at his previous or similar occupation. Id., at p. 61.

Each of the three independent physicians prepared a report detailing the content of their respective telephone conversations with the treating physicians, and, according to the file documents, faxed that report to the treating physicians and asked for their comments, including any disagreements or additional information they might want to add (rec. doc. 16, pp. 63-64, 73-74, 87-88).  The reports also state that if the treating physician has nothing to add, he need not respond.  The record contains no evidence of responses which either clarify, contest, or remark in any way on the summaries of the telephone conversations, nor

is there any evidence by way of supplementation of the record that the reports of the independent physicians are inaccurate.[2]

On October 16, 2006, defendant informed plaintiff that based on the review of all of the evidence currently in plaintiff's file and the results from the independent medical reviews performed by Drrs. Vasquez, Marks, and Oleander, it was upholding its previous decision to deny plaintiff's application for long-term disability benefits (rec. doc. 16, p. 120). Defendant further stated as follows:

> While we are not disputing that Mr. Burtch may experience symptoms related to his multiple medical conditions, may require ongoing medical and psychiatric treatment, and might have been unable to work during certain periods of time in March, April, and July 2005 due to exacerbations of his pulmonary condition; the evidence neither supports that he remained unable to perform one or more essential duties of his occupation during the entire elimination period nor beyond 9/18/2005 which is the end of the elimination period. The restrictions and limitations indicated by the independent medical reviewers are compatible with the essential duties of Mr. Burtch's occupation as an Underwriter. Therefore, Mr. Burtch does not meet the definition of disability or disabled during the elimination period or after, and benefits are not payable according to the policy.

Id.

Defendant also notified plaintiff of his right to bring a civil action against it under ERISA for disability benefits, which is now before the Court.

_This Litigation_

The LTD Policy grants defendant the "full discretion and authority to determine eligibility for benefit and to construe and to interpret all terms and provisions of the Group Insurance Policy" (rec. doc. 16, p. 22). Thus, the abuse of discretion standard of review

---

[2] The plaintiff argues that the reports are self-serving and misleading and that the treating physicians made other statements that differ from those in the reported conversations, but there is no evidence that the reports are inaccurate or that the treating physicians later clarified or added to or subtracted from their reported statements.

is applicable to the plan interpretation made by defendant.  See *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed. 2d 80 (1989).  If a decision is supported by substantial evidence and is not erroneous as a matter of law, it is not arbitrary and capricious or an abuse of discretion. *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 639 (5th Cir.), *modified on other grounds*, 979 F.2d 1013 (5th Cir. 1992).

Plaintiff argues that defendant, as both the insurer and administrator of the LTD Policy, has a conflict of interest in determining whether plaintiff qualifies for benefits under the LTD Policy.  In reviewing a decision to deny benefits by a plan administrator who is also the insurer which pays benefits, the court must weight that conflict as a factor in determining whether there is an abuse of discretion. *Firestone Tire and Rubber Co. v. Bruch*, 109 S.Ct. at 956.  The Fifth Circuit applies a "sliding scale" in reviewing such decisions and in the absence of evidence with respect to the degree of the conflict, "it is appropriate to review the administrator's decision with only a modicum less deference than we otherwise would." *Vega v. Nat. Life Ins. Services, Inc.*, 188 F.3d 287, 301 (5th Cir. 1999).  Plaintiff has produced no evidence other than the fact that defendant is the plan administrator and the insurer.  Thus, the decision to deny long-term disability benefits under the LTD Policy is reviewed with slightly less deference due to defendant's conflict of interest.

As noted above, the LTD Policy provides that defendant will pay disability benefits if during the elimination period, March 19, 2005, through September 19, 2005, and for 24 months thereafter, the employee is prevented by illness, injury, or sickness from performing one or more of the essential duties of his own occupation (rec. doc. 16-6, p. 27). Plaintiff's occupation of "underwriter" has been described as requiring plaintiff to perform the physical

-16-

duties of standing occasionally, walking frequently, sitting continuously, stooping, kneeling, crouching, and reaching overhead occasionally, pulling file drawers under 5 pounds occasionally, lifting and carrying files under 5 pounds frequently, using the keyboard and/or writing continuously -90% of the time; using the telephone frequently - 60% of the time (rec. doc. 16-5, p. 59).

Plaintiff's arguments generally center around defendant's process of review and the weight given various pieces of evidence.  For example, plaintiff argues that defendant abused its discretion by failing to examine plaintiff during the appeal process, but plaintiff can point to no rule requiring such an examination.  While defendant did not examine the plaintiff, it nevertheless conducted more than a mere review of plaintiff's file in determining whether he was eligible for benefits under the LTD Policy. Defendant reviewed all of the medical and other evidence submitted by the plaintiff in support of his application for long-term disability benefits and conducted its own investigation of plaintiff's claim by engaging the services of Drrs. Marks, Oleadner, and Vasquez to perform an independent review of plaintiff's file and to interview  plaintiff's treating physicians regarding plaintiff's ability to perform his own occupation.  All three of the independent physicians concluded that plaintiff could perform his own occupation within the elimination period.  And all three of the independent examiners asked for further input from plaintiff's treating physicians should they deem it necessary.

Plaintiff's medical records indicate that plaintiff's condition was managed through medication and did not require hospitalization.  Plaintiff required oxygen only during the nighttime and upon exertion.  Although plaintiff's treating physician, Dr. Hines, initially indicated that plaintiff was unable to work, he later indicated that plaintiff could perform a

desk job, although his bouts of infection might cause him to be unreliable.  Similarly, plaintiff's treating physicians, Drrs. Veraldi and Dynes, confirmed that there was no medical evidence to support plaintiff's complaints of cognitive deficits.

In the face of this evidence, plaintiff further argues that defendant is required to give weight to the findings of its treating physicians.  The problem with this argument is that even if the Court were required to give weight to plaintiff's "treating physicians," which it is not, plaintiff's treating physicians do not present uncontradicted evidence that plaintiff is disabled - or unable to perform a sedentary job - under the LTD Policy. See *Black &Decker Disability Plan v. Nord*, 538 U.S. 822, 123 S.Ct. 1965 155 L.Ed.2d 1034 (2003); *Salley v. E.I. DuPont de Nemours & Co.*, 966 F.2d 1011, 1016 (5th Cir. 1992).

Plaintiff also argues that defendant ignored the effects of his co-morbid illnesses on his disability, but a review of the analyses performed by Drrs. Vasquez, Oleander, and Marks shows that they thoroughly examined the medical evidence submitted by each treating physician and considered the effect plaintiff's co-morbid illnesses would have on his ability to perform his occupation. For example, after reviewing Dr. Broussard's medical information, Dr. Marks made a specific recommendation that an accommodation be made for plaintiff's future employment in his report (rec. doc. 16, p. 71).  Dr. Marks recommended that due to plaintiff's degenerative spine changes that he not be required to lift, pull, or push greater than 10 pounds on a more than occasional basis, which his own occupation does not require.  Dr. Marks also suggested that plaintiff avoid improper flexing of the spine. Id.

Plaintiff also argues that other disability decisions should impact, if not be dispositive, on this decision.  Plaintiff submitted other evidence in support of its claim for benefits, including the August 2005 decision by the Social Security Administration granting plaintiff

disability benefits and certain articles from an Internet website on disability standards adopted by the American Medical Association and American Thoracic Society.  Under the law as it currently stands, however, a plan administrator cannot base its decision to grant or deny benefits based on the determination of the social security administration or standards used by other agencies.  Depending upon the provisions of the ERISA plan, the eligibility for benefits may be vastly different than under other agencies.  Additionally, the evidence offered in support of the social security claim may be different from that offered in support of the claim for benefits under the LTD Policy.  Thus, defendant is not bound to give any special deference to the determination made by the social security administration. *Horton v. Prudential Ins. Co.*, 51 Fed. Appx. 928 (5th Cir. 2002); *Johnson v. Sun Life Assurance Co. of Canada*, 2000 WL 33225469, *9 (M.D. La. 2000).[3]

On the record presented, the administrator acted within its discretion in denying the disability claim.  There is a rational connection between the known facts and the decision and between the found facts and the evidence. There is, therefore, sufficient evidence in the record for a reasonable mind to reach the conclusion that plaintiff was not disabled from his

---

[3] The facts of the instant case are distinguishable from the facts in *Adams v. Metro Life Ins. Co.*, 2007 U.S. Dist. LEXIS 56912 (2007), cited by plaintiff, in that the defendant in this case never granted plaintiff's claim for long-term disability benefits, never assisted plaintiff in obtaining social security benefits, never attempted to recoup overpayments from the money paid to plaintiff by social security; therefore, there is no conflict of interest that would require defendant to consider the Social Security Administration's award of benefits as persuasive.

occupation as an underwriter.  The fact that there was some countervailing evidence in the record does not lead to the conclusion that defendant was arbitrary and capricious in denying the claim.

Accordingly, it is recommended that,

1) defendant's motion for summary judgment (rec. doc.15) should be **GRANTED**; and

2) plaintiff's motion for summary judgment (rec. doc. 19) should be **DENIED**.

Signed in Baton Rouge, Louisiana, on March 11, 2008.


**MAGISTRATE JUDGE DOCIA L. DALBY**

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

**ROBERT R. BURTCH**                              **CIVIL ACTION**

**VERSUS**                                        **NUMBER 06-950-RET-DLD**

**HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY**

**NOTICE**

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the U.S. District Court.

In accordance with 28 U.S.C. §636(b)(1), you have ten days from date of receipt of this notice to file written objections to the proposed findings of fact and conclusions of law set forth in the Magistrate Judge's Report.  A failure to object will constitute a waiver of your right to attack the factual findings on appeal.

**ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.**

Signed in Baton Rouge, Louisiana, on March 11, 2008.

_____
**MAGISTRATE JUDGE DOCIA L. DALBY**